Peggy DAWSON, on behalf of herself and all others similarly situated

v.

The UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT et al.

No. C 76–232 A.

United States District Court,
N. D. Georgia,
Atlanta Division.

Dec. 30, 1976.

Robert N. Dokson, Ellenberg, Wildau & Stagg, Atlanta, Ga., for plaintiff.

John W. Stokes, U. S. Atty., Richard A. Horder, Asst. U. S. Atty., Atlanta, Ga., for defendants.

## ORDER

JAMES C. HILL, Circuit Judge, Sitting by Designation.

The plaintiff, Peggy Dawson, formerly resided at 484 North Highland Avenue, N.E., Apartment 14, Atlanta, Georgia, in which building she was a tenant. The defendant, Second Bedford Pine Apartments, Ltd., is a limited partnership doing business in the State of Georgia and purchased the building in which the plaintiff lived. The defendant partnership intended to rehabilitate the building and demanded that the plaintiff vacate her apartment. The issue in this case is whether the plaintiff is entitled to the benefits of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C.A. § 4601 *et seq.*

The Bedford-Pine Urban Redevelopment Project Area was approved for urban renewal pursuant to the Neighborhood Development Programs Act, 42 U.S.C.A. § 1469 *et seq.*, on January 1, 1969. The Neighborhood Development Programs Act was enacted in 1968 as an addition to Title I of the Housing Act of 1949, 42 U.S.C.A. § 1441 *et seq.* The Neighborhood Development Programs Act authorizes the Department of Housing and Urban Development (HUD) to fund certain urban redevelopment activities such as construction of new public facilities, rehabilitation and demolition on an annual or "action year" basis. Before any community can qualify for assistance under the Neighborhood Development Programs Act there must be an urban renewal agency and an Urban Renewal Project Area meeting the requirements of state law. Under the Neighborhood Development Programs Act there is no long-term contractual commitment to complete all of the redevelopment activities proposed for the project area, although those activities are to be realistically planned and proposed for a multi-year period. This differs from traditional urban renewal in which there was a long-term

contract between HUD and the local agency, usually spanning several years, in which HUD agreed to fund all of the redevelopment activities necessary to implement a given redevelopment plan for the project area. The plaintiff did not reside in the Bedford-Pine Urban Redevelopment Area as approved in 1969.

In March, 1972, the City of Atlanta was officially designated as a "Project Rehab" city by HUD. HUD thereby pledged assistance in the form of insurance of mortgages on properties suitable for rehabilitation pursuant to Section 236 of the National Housing Act, as amended, 12 U.S.C.A. § 1715z–1, and the payment of interest subsidies or rent supplements pursuant to Section 101 of the Housing and Urban Development Act of 1965, as amended, 12 U.S.C.A. § 1701s. The governing body of the City of Atlanta selected four target areas in which a concentrated effort would be directed in furtherance of Project Rehab. These four target areas were known as Bedford-Pine, Bond, Old Fourth Ward, and English Avenue. The plaintiff resided in the Bond target area. While the City of Atlanta designated certain target areas, HUD's approval of Atlanta's Project Rehab was not restricted to target areas and any property within the city limits of Atlanta, otherwise eligible, would have been acceptable to HUD.

Only one of the target areas, Bedford-Pine, selected by the City of Atlanta under Project Rehab was located near the Neighborhood Development Programs Project area discussed earlier. While the Bedford-Pine Project Rehab target area contained properties outside the Neighborhood Development Programs Project Area, it also overlapped a large portion of that part of the Neighborhood Development Programs Project Area already scheduled for rehabilitation activities under the Neighborhood Development Programs Act. Rehabilitation was one of the redevelopment activities scheduled for the Bedford-Pine Neighborhood Development Programs Project. While the Atlanta Housing Authority has used Section 236 of the National Housing

Act as a rehabilitative method within the Neighborhood Development Programs Project Area, other rehabilitative methods used within this area include rehabilitation loans pursuant to Section 312 of the Housing Act of 1949, as amended, 42 U.S.C.A. § 1452b; rehabilitation grants pursuant to Section 115 of the Housing Act of 1949, as amended, 42 U.S.C.A. § 1466; and Urban Renewal Housing Mortgage Insurance pursuant to Section 220 of the National Housing Act, as amended, 12 U.S.C.A. § 1715k.

The parties agree that a person forced to relocate as a result of the Neighborhood Development Programs Project is entitled to relocation assistance under the provisions of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C.A. § 4601 et seq. (the "Act"). The parties also agree that the plaintiff in this case was not forced to relocate pursuant to this project. The plaintiff was forced to relocate as a result of the City of Atlanta's participation in Project Rehab. Thus, the questions presented are whether the plaintiff is a "displaced person" within the meaning of the Act and, if not, whether the denial of relocation assistance to her contravenes the equal protection clause of the United States Constitution. In addition, the plaintiff makes some argument that her displacement was the "direct result" of activities within the Neighborhood Development Programs Project Area.

The plaintiff places heavy reliance upon *Moorer v. Department of Housing and Urban Development*, 417 F.Supp. 1261 (W.D. Mo.1976). The plaintiffs in *Moorer* were displaced by the identical Project Rehab program as is the subject matter of this case in Kansas City, Missouri. The court in *Moorer* was impressed with the evident Congressional intention to enact broad and comprehensive legislation intended to cover all persons displaced by federal or federally assisted programs. Relying heavily upon the Act's definition of "displaced persons," the Court held that the Act clearly covered persons in the position of the plaintiffs who were forced to move from their residences as a result of the acquisition of real proper-

ty by private developers. The Court in *Moorer* concluded that Project Rehab was a program or project undertaken by a federal agency, or with federal financial assistance and, consequently, the plaintiffs were entitled to full relocation assistance and benefits under the Act.

The defendant HUD principally relies upon two cases with somewhat dissimilar facts from the case *sub judice.* They are *Caramico v. Secretary of the Department of Housing and Urban Development,* 509 F.2d 694 (2d Cir. 1974) and *Parlane Sportswear Company, Inc. v. Weinberger,* 513 F.2d 835 (1st Cir.), *cert. denied,* 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1975). In *Caramico* the plaintiffs were tenants in dwellings the mortgages of which were insured by the Federal Housing Administration, a subagency of HUD. The landlords defaulted and the mortgagees sought to evict the plaintiffs from their homes to comply with federal regulations which required vacant delivery. The Court rejected the plaintiffs' contentions that they were entitled to relocation assistance under the Act. The Court concluded that these acquisitions by the federal government must be characterized as "random and involuntary while normal urban renewal contemplates a conscious government decision to dislocate some so that an entire area may benefit." *Id.* at 698. Furthermore, in discussing the purposes of the Act the Court noted:

> . . . Various sections of the Relocation Act also indicate that construction programs are the type Congress had in mind in providing displaced person assistance. Section 4626 refers to "actual construction" of the project, section 4625(a) mentions economic injury to neighboring property due to the property acquisition, and section 4651 describes acquisition methods that are inconsistent with the takeover of defaulted property by the FHA.
> Thus, it is clear that the Act contemplates normal government acquisitions, which are the result of conscious decisions to build a highway here or a housing project or hospital there. In such cases, the acquisition of property and the relo-

cation of certain individuals is a necessary first step in the project.

509 F.2d at 698. (footnote omitted).

The Court pretermitted a decision on whether the exclusion of guarantees or insurance in the definition of "federal financial assistance" also excluded the situation in which the plaintiffs found themselves.

In *Parlane Sportswear* Tufts University sought to evict a tenant in order to renovate and expand its medical facilities to fulfill the purpose of a federal grant. The Court rejected the tenant's assertion that the Act was applicable to acquisitions by private institutions which received federal financial assistance.

> . . . The committee report states the statute is aimed at alleviating the hardships of displacement for "public works projects" and "public improvement programs," and none of the examples, furnished therein (highways, reservoirs, public buildings, facilities or services, urban renewal projects, hospitals), approximate the arrangement here, which Tufts initiated and administers. Parlane contends that the phrase "federal financial assistance" appearing in the statutory definition of displaced persons, § 4601(6), and statement of policy, § 4621, demonstrates an intent to include all such projects. But we are satisfied, especially in light of the committee report, that this phrase was intended to cover only such assistance to State agencies.

513 F.2d at 837. (citations omitted).

The Court was also quick to point out that the interpretation sought by the tenant could lead to many difficult situations, "if, for example, the federal assistance was merely supplementary to the grantee's own funds and contributions." *Id.*

■ The determination as to whether the plaintiff is entitled to the benefits afforded under the Act is not an easy one. The Court has carefully considered the cases set out above as well as the legislative history of the Act contained in 1970 U.S. Code Congressional and Administrative News, pp. 5850–5875. In addition, counsel for

both sides have submitted thorough and well-reasoned briefs in support of their respective positions. Upon careful consideration of all of this material the Court has reached the firm conviction that the plaintiff is not entitled to the benefits and assistance of the Act.

■ The Act defines "displaced person" in Section 4601(6) as

> any person who, on or after January 2, 1971, moves from real property, or moves his personal property from real property, as a result of the acquisition of such real property, in whole or in part, or as the result of the written order of the acquiring agency to vacate real property, for a program or project undertaken by a Federal agency, or with Federal financial assistance; and solely for the purposes of sections 4622(a) and (b) and 4625 of this title, as a result of the acquisition of or as the result of the written order of the acquiring agency to vacate other real property, on which such person conducts a business or farm operation, for such program or project.

An argument can be made that the plaintiff was a person who moved her personal property from real property as a result of the acquisition of the real property "for a program or project undertaken by a Federal agency." Thus, the fact that the real property was acquired by private developers as opposed to a governmental agency is of no relevance. · This appears to be the main line of reasoning used by the Court in *Moorer*. However appealing this line of reasoning may appear on its face, the statute as a whole and its legislative history belie the notion that the statute sets up such a simplistic test. If one accepts this test, the statutory alternative "or with federal financial assistance" becomes surplusage. If the statutory phrase "program or project undertaken by a Federal agency" does not contemplate that the acquisition is to be by a federal agency, then to include, also, acquisitions "with federal financial assistance" is redundant. An acquisition as a result of a program or project undertaken by a federal agency, yet acquired by some third party, would necessarily presuppose some federal involvement imbuing the program or project with a federal character, to wit; federal financial assistance. While the language of the statute is less than unambiguous, the legislative history of the Act supports the view that the acquisition referred to must be by a federal agency.

The question next arises as to whether the plaintiff's displacement was the result of the acquisition of real property for a program or project undertaken "with Federal financial assistance." The Act defines "Federal financial assistance" in section 4601(4) as

> a grant, loan, or contribution provided by the United States, except any Federal guarantee or insurance and any annual payment or capital loan to the District of Columbia.

The defendant asserts that the acquisition referred to relates to purchases by state agencies while the plaintiff argues that the phrase refers to any acquisitions made with federal financial assistance. The acquisition which is the subject matter of this suit was made by a private developer. The Court is persuaded that the defendant's position is correct.

Even more importantly, however, the phrase with "Federal financial assistance" specifically excludes guarantees or insurance. The only federal assistance involved in this case is the benefits conferred by sections 101 and 236 of the National Housing Act. The type of assistance provided by these sections could hardly be better described than "Federal guarantee or insurance." Thus, even assuming that the acquisition by private developers is covered by the Act, the mere provision of insurance and rent supplement guarantees is insufficient to bring the purchase within the coverage of the Act.

■ The plaintiff's equal protection argument was answered by the Court in *Caramico*:

> Plaintiffs make the further argument that in holding them ineligible for benefits, the district court created constitu-

tional difficulties by enforcing an arbitrary distinction between them and others admittedly eligible for relocation assistance. But this is simply to say that since the Government has chosen to aid some it must aid all, and it is clear that the "legislature may select one phase of one field and apply a remedy there, neglecting the others." *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955).

509 F.2d at 699.

Finally, the plaintiff contends that she is entitled to assistance under the Act as her dislocation was a "direct result" of urban renewal activities under the provisions of section 4637 of the Act, to wit; the Neighborhood Development Programs Act Project. Plaintiff argues that this results from the fact that the purchase of her building *outside* of the Neighborhood Development Programs Project Area occurred only because the owner would not sell its buildings *inside* the development area without also selling those it owned outside the area. The Court disagrees. Simply stated, the proximate cause of plaintiff's displacement was the decision by the owner of her apartment building to sell to a private developer. While the decision of her landlord to sell may have been influenced by the urban renewal activities in the Neighborhood Development Programs Project Area, her dislocation was not the "direct result" of those activities. Her dislocation was not a result of the urban renewal activities but came about because of a decision made by her landlord.

Wherefore, judgment is hereby directed to be entered in favor of the defendant and against the plaintiff.

SO ORDERED, this 30th day of December, 1976.